We will now start with our 5th case of the day, 4th oral argument, 20-60-40, United States v. Varnell. Ms. Jordan, are you ready to proceed? Yes, your honor. Go ahead. May it please the court, my name is Rachel Jordan and I represent the appellant in this case, Jerry Drake Varnell. And I am optimistically going to try to reserve two minutes for rebuttal, your honors. The outrageous government conduct offense exists to prevent overzealous law enforcement officers from creating crime for the purpose of prosecuting it. Yet Mr. Varnell is currently serving a 25-year sentence for a crime that he would not and could not have committed without the substantial involvement of the United States government. This court has held there are two ways the government's conduct can be outrageous, excessive involvement in the creation of the crime or substantial coercion to induce the crime. The totality of the circumstances in this case demonstrate that the government was excessively involved in creating the crime that Mr. Varnell was convicted of and his conviction should be reversed. There's no bright line test for determining when the government's involvement becomes excessive, but this court has identified several factors to take into consideration. First, whether the defendant was already engaged in criminal activity at the time of the government's involvement or whether there was an ongoing criminal enterprise and whether the defendant was an eager and active participant in the crime. In this case, both of those factors weigh in favor of the appellant. When the government got involved, the appellant had not committed any crime. So, in the fall of 2016, he made statements to his friend Brent Ellison, general statements that he was interested in bombing a building. His speech in the fall of 2016 was not criminal and he had not taken any overt act towards making his statements a reality. The trial court found that his statements in the fall constituted a threat and therefore could be considered a crime. However, the Supreme Court's decision in Virginia v. Black indicates that in order for speech to be a true threat and therefore a crime, the speaker must intend the recipient of his speech to feel threatened. In this case, the appellant was speaking to what he believed to be a like-minded individual in Mr. Ellison's who had a prior conviction for threatening to blow up the Norman, Oklahoma Police Department and encouraged his speech. He said things like, man, your views are on point and, you know, that's beautiful and really encouraged the speech that Varnell was doing in the fall of 2016. So, he had not engaged in a criminal activity, he had not committed a crime, he had not taken any overt act towards making his statements a reality, they were merely statements that he made in a private conversation with his friend, Mr. Ellison. But he was also not an eager and active participant in the crime. So, in January, the government learned that Varnell had made these statements and they opened up an investigation. There's an intelligence report dated February 10th of 2017 that says that Varnell not only had not repeated his statements, but that he lacked the means to act on them. The government then employed Mr. Ellison's to start contacting Varnell to try to get him to act on his statements. Wait, remind me how the government first heard about the statements. Wasn't it Mr. Ellison who reported him? It was, Your Honor. It was Mr. Ellison's who reported it after receiving a nine-month sentence for breaking the terms of his release. And he then informed the FBI that he had information about someone who was making these statements and that he could help them build a case against him, you know, if only he were out and able to do that. So, he was released. He began contacting Mr. Varnell and spent the next two months baiting him with statements about corrupt government officials and saying things like, you know, can you believe these we need to change the world and how are we going to do that? And hey, man, you talked about having a team before and have you found members for your team? And on three separate occasions during the course of these conversations, he tells Varnell, I've got this guy, he'd be good for your team. Or what about this guy? And Varnell is not interested and he never takes the bait. And he even tells Ellison's, I've calmed down a lot since then. So, the statements that he made in the fall of 2016 don't reflect his current state of mind in 2017. In May, the informant tells the agent, I think he was venting. He's not prepared to act. And he tells the agent, I think he's avoiding it. And the agent says, I think he's avoiding you. And at that point in time, instead of accepting the fact that Varnell was not a threat, they decided to make him one. And they made a conscious decision to push. And when they did that, their conduct became outrageous. So, the specific government conduct you're talking about is what exactly? The specific government conduct I'm talking about is the fact that they supplied him with all of the materials he needed to commit this crime and they pushed him to do it. He would not have done it without their pressuring him. The informant, the way that he talked to Varnell throughout the course of this investigation or sting operation, rather, was that he berated him and he told him, you need to do this. You need to do this. Of course, he's not. That's not government conduct. Well, it's not. But it is conduct. One second, please. Ms. Anderson, are you able to raise the volume in Judge Seymour's mic? Because it's hard to hear. I just turned it up. Oh, okay. I was asking about what is the specific government conduct because Ellison's conduct is not government conduct. Right. But it is conduct that the government was aware of and encouraged Ellison's to engage in. But also, they supplied every single component that was needed to commit this crime. You're talking about the overall conduct of the FBI is the government conduct? Yes, Your Honor. Okay. And so, in supplying him with these items, the undercover agent who was referred to as the professor, he told the appellant, I need you to get these things. I need you to get a truck, barrels, gloves, tape, and a burner phone. And the appellant did not supply one single item that they tasked him with. The government supplied the expertise that was needed to build this bomb. And when they asked him repeatedly over the course of this operation, have you gotten these items yet? When are you going to get these items? And the appellant either ignored their text messages or phone calls, or he responded with an excuse as to why he hadn't provided them. And frankly, Your Honor, it's understandable why he wouldn't have provided a thousand pounds of info because he wasn't able to get it. But he didn't supply one single thing, not the gloves, not the tape. When the agent picked him up on the day of, and let me back up a little bit, Your Honor, he had opportunities to provide these things. He could have supplied containers, evidence was presented at trial that he had containers available, but he just didn't want to do it. He could have purchased the gloves, but he told the agent that he didn't have any money. Well, evidence was presented at trial that, in fact, he had almost $100 in his pocket when he told the agent that. So he could have contributed much more than he did, but he didn't do it. And when the agent told him, I need you to pick a date, and I need you to pick a target, he asked him several times, have you picked a date yet, have you picked a date yet? And when the appellant didn't pick a date, they said, well, how about August 11th? And he said, sounds good. They told him they needed him to pick a target. And he wanted to go to Amarillo and scout, and the agent said, well, how about Bank First? And the appellant agreed. So he was a passive participant in a plan that, frankly, was orchestrated by the FBI. So on the day that they pick him up to go build the bomb, you know, the appellant had claimed to know about chemistry. They gave him handwritten instructions on how to put this bomb together and then showed him how to do it. He still didn't do it right. He still needed help. And then the agent handed him the keys to the truck to drive it downtown, and the appellant says, well, I'm not driving that. I don't have a license. And the agent said, I thought you understood that was the plan. And, Your Honors, it's clear from that statement that this was the government's plan. It was not the appellant's plan. The government claims that this was the appellant's plan, and they merely stepped in to assist him. But that's not what happened. And, Your Honors, when you are considering whether the government's conduct throughout the investigation is outrageous, this court held in United States v. Dyke that the outrageousness of government conduct depends in part on who the government is dealing with. And the appellant in this case was a diagnosed schizophrenic. Now, the government wants to minimize that and say that they didn't know he was mentally ill, and therefore they shouldn't be held accountable for that. But evidence was presented at trial that they knew as early as March of 2017 that there was at least an allegation that he was schizophrenic. They say at some point after that, they received information that he was potentially malingering or faking it. They don't say when that was. And what they did at that point, instead of investigating and looking deeper into whether he was, in fact, schizophrenic, they chose to go with the version of his mental health that allowed them to continue with their operation. But that version that they relied on wasn't just picked out of thin air. That was reports in a court proceeding, was it not? It was, Your Honor, but again, if they had done due diligence after that, they would have discovered that he, in fact, had a very long, very well-documented history of mental health treatment. And I believe... Why can't they rely on a medical examination for the purpose of determining his mental health in a court proceeding? That would seem to be a pretty good place, something that could reasonably be relied on. You don't need to go and second-guess the expert witness. And I believe the court adopted what that witness said. But why was that not enough?  The long, well-documented history of his mental health would have demonstrated to the government that he was not, in fact, faking it. And the government's own expert who examined him after he was arrested diagnosed him with substantially similar disorders, schizoaffective disorder. So he was not faking it. And I believe that when there are two allegations, there are two different versions of his... Oh, I'm sorry. Wasn't it also clear that he was on medication that was working during this time period? Well, he was on medication, Your Honor. And so one of the things that the informant did was smoke marijuana with the appellant every single time they met in person. The statements that he made during these encounters were used against him. But evidence was presented at trial that when a schizophrenic smokes marijuana, it can exacerbate the symptoms of their schizophrenia, thereby making the medication less effective. But in addition to that, the, you know, whether his schizophrenia was under control, evidence was also presented at trial that in the early part of 2017, which is the same time period that all of this was happening, he was trying to develop a drug to cure mind control. So the psychologist testified that he believed he could create something that is not in fact reality. And also that someone with his condition has difficulty standing up for himself, even when assertiveness is warranted. So his condition played a role in his passive going along with the informant and the FBI. But in reality, he attempted to back out when he refused to provide or failed to provide the simple items that they told him to. And I'd like- The smoking of marijuana was he and Mr. Ellison, correct? Yes, Your Honor. It was not he and the professor. It was not he and the professor. I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. Mr. Dillon, are you ready to proceed? I am, Your Honor. May it please the court. My name is Matt Dillon. I'm appearing on behalf of the United States. This court should affirm the defendant's conviction and sentence because Mr. Barnell has failed to show excessive government involvement in the defendant's crimes. And the district court properly exercised its considerable discretion in its application of the terrorism enhancement. Mr. Barnell had a desire to commit these crimes and was simply provided the opportunity to do so. Under the defense argued by the appellant in this case, they would have to show that the government's involvement was so excessive in the creation of the crime and significant or significant government coercion to induce the crime. Under the totality of the circumstances, the government's conduct must be so shocking, outrageous, and intolerable that it offends the universal sense of justice. Citing to United States v. Wagner. You agree, counsel, you agree that he did not commit a crime before Mr. Ellison reported him to the FBI. Those threats were not crimes, were they? We do not agree with that. We think that the court outlined a number of crimes that, at least arguably, that he did commit state crimes and federal crimes. The court found that they did believe that his statements were true threats and arguably violated 844E. Doesn't the threat have to be directed at the victim to make it a threat? I believe the precedent is clear that the victim does not have to receive the actual threat for a threat to have been transmitted in interstate commerce. Additionally, you have the threat to the government as a whole. And then two, also his ultimate crime or attempted to his attempt was directed essentially at a building. I think that that bears some weight on how do you express that threat to a building other than telling people, I want to blow up a building. I want to blow up this building. So I don't think that's dispositive. But yes, we do believe in a bare minimum, and it's not even required that he was involved in criminal activity. But I think that the evidence is found by the district court is that he actually had committed crimes, at least there's probable causes, obviously believe that he had. What crimes other than the threats? Other than the threats, I think that the court had noted, as the government had argued in its brief to the district court, there was conspiracy. There was a state terrorism charge. There was solicitation. The defendant is the one that would continuously talk about wanting a team. He said that he had a like-minded individual, and arguably before the government knew anything. That's not a crime. No, in talking about wanting a team, it was wanting a team for a specific purpose. He wanted to bomb a building and affect government conduct. My question is, what were the crimes other than the threats? Again, I believe that there was conspiracy to commit the crime. I believe there was solicitation to commit a crime under Oklahoma law. But I think that it can't be ignored that case law doesn't say that he actually has to have committed a crime. It is only a factor to be considered in this analysis. Who did he solicit? Brent Ellison's first and foremost, and that was before any government involvement. That was before Mr. Ellison's came forward to the FBI and had disclosed anything. This was in 2016. Or I'm sorry, in the fall, preceding his departure to New Mexico. Also, he told Mr. Ellison's that he believed that he had found another like-minded individual. That was the conversation. He said, you know, is this just something for a team or something else? And he said both, that this guy was going to be operational with them. While the government could not find the evidence of who it was that he solicited, this is in fact what he had done. The defendant specifically pointed to a few items that I believe in Judge Seymour's question about what had been the government conduct that's specifically being complained of. The appellant talks about that we supplied all the materials. There was a lengthy discussion in trial about things such as info, debt core, things like that. Why the government didn't want him continuing to make homemade explosives. It was dangerous. It would be outside of our control. You had the undercover riding in vehicles with him. It was obviously a dangerous scenario despite also the idea that he could go off on his own without being supervised by the undercover and commit the crime and we wouldn't be in a position to stop it. The defendant did offer certain items. Is there evidence he didn't have the money to do that? Judge Seymour, I still can't hear you. You can't hear me? No. Can you now? Yes. Thank you. I'm sorry, Your Honor. What was the question? I forgot what it was. Oh, I'm sorry. That's okay. Your pitch is still pretty low. Ms. Anderson, is that something that can be done at your end? Unfortunately, I can't adjust her volume settings for her microphone. She might have to try to speak up a little bit louder. Okay. I forgot my question, so you guys go ahead. Okay, go ahead, Mr. Dillon. But on the supplied materials, I think that what should be seen in this case, and I think it was clear at trial, is besides the goal of wanting to start a revolution or civil war and to instigate that by blowing up a building, is that the defendant had one clear thing that he wanted to do through this crime, which was not get caught. Whether it was discussion about only wanting to use burner phones, he told the undercover at the time of the crime itself, I don't have a problem dialing the number. I just don't want to use my phone to do it. The barrels, they're at his parents' property. They're out in the open. And if he took them reasonably, they would have been viewed as missing things that could lead up to him. He asked the undercover about what would happen with fingerprints. Would they essentially be incinerated when the device went off? He asked about not doing things where there were cameras around. He was concerned about being viewed committing his crimes. So I think the idea that he didn't supply some of the things that had originally been requested is also reasonable. But again, we're also having to look at this in the context of totality of the circumstances. We have to look at the crime of what this person is talking about doing. We're not dealing with an individual who's selling very small quantities of drugs on a street corner. We're talking about somebody who wanted to detonate a thousand pound device as he described it, what the Oklahoma bomber went with. You know, obvious potential loss of life, even though he wanted to minimize that. He himself acknowledged that loss of life was probable and said, you know, essentially, you got to break eggs to make an omelet. And that's why people don't go through with these things. They can't get that reality, the same reality that he's willing to acknowledge. And so. But he wanted to bomb a bank or a data center. How is that conduct against, how is that against government conduct? Well, I think nobody would know except for what he said that he was doing because he was mad at the government. Doesn't there have to be some specific objective government conduct that he's retaliating against? I think three points on that. First, as far as the argument, as it was laid out in the case, Hansberry, I would once again, re-urge that the defendant never raised whether the conduct was objectively against the government. So I think that they've waived that argument. But to address the point. They waived the requirement that the government prove an element of the offense. Is that what you're saying? No, I think at that point that we're talking about, whether that is a sentencing argument, whether 3A1.4 applied, whether it was against the government was not an element of the offense itself. So, but as to the point of whether it was objectively against the government. First, there was conversation or there was testimony from the undercover that Mr. Barnell specifically discussed the lack of feasibility of going after a government agency. He thought security would be too high. They discussed, you know, for instance, NSA, and that a SWAT team would drop immediately onto them if they were doing that. So he wanted soft targets. The thing that he never wavered from, however, is that the conversations where he talked about his hatred of the government due to his family's position, that he believed that he had been, I believe the testimony was effed over by the government in his previous prosecution. What's the objective government conduct? Quite simply, he objects to the existence of the government. He wants a revolution. He wants a civil war, and he hated both sides of the government at election time, but he wanted a different government. I don't know how more clear there could be an effect on government than for that entire government to be removed and a new government put in place. In his own words, he wanted this to start a revolution for the people to rise up. And this was the catalyst for that. This was the thing that, no pun intended, but that would to ignite this civil war, this revolution. So to actually overthrow the government, I think is a clear showing that it is designed to affect the government. And his previous statements show that he wanted to retaliate against that same government he wished to overthrow. What about retaliate? Ansboury says you have to retaliate against objective government conduct. What is that here? Well, and that is one prong of 3A1.4. But to retaliate again, he blamed the government for his family's position, loss of money, loss of land. But it seems so general and vague to me. Is that sufficient for this terrorism charge? I believe so. But additionally, he specifically said that he blamed the government. He got effed over in his previous prosecution. He thought that Mr. Ellison had also been effed over, according to him, or according to the testimony, in having been prosecuted for his underlying crime. So he had a very specific grievance against the United States government. And again, but his motivation in getting back, I think is clear on that point. But just because he chose the non-government target, he still, the crime was designed to retaliate against those past acts and to affect the government. I don't think that it is unreasonable to believe that a thousand-pound amphibomb being detonated in downtown Oklahoma City wouldn't have had, in his mind, that desired effect and objectively had an effect on the government. The defendant also addresses that Mr. Ellison's question about he was the one that came forward. I think it's important to note his testimony showed he originally came forward anonymously through his attorney. He wasn't looking to strike a deal because of his revocation of his supervised release that had already been dealt with. The report that the defense mentions that in February that says that Mr. Varnell didn't have a car or money, it's important to note Mr. Ellison's, that's where that information came from. And Mr. Ellison's didn't meet with Mr. Varnell again until after that point. So he's basing that on what he knew of Mr. Varnell back in November. And all he said is, I don't think that it's taking place necessarily tomorrow. I just know what he said. And at the time that Mr. Ellison's knew him, he didn't have a car at that time. But to say that that somehow dissuades the government's involvement in this investigation, I think to quote Dyke, or I'm sorry, it would be derelict of their duty not to continue that investigation. The discussion concerning his mental health, I think that that has to be drawn to its logical conclusion. Even if the defendant is schizophrenic, it's how would that have affected him, even if the government had gone to the lengths that the defendant thinks that they should have gone to. His own expert said that his symptoms were in full remission and that he'd been taking medication for three years. His expert also said that nothing about his mental health actually affected his decision-making to go along with this plan, I think were the words. And so had FBI investigated it, they would have found the same thing, whether malingering or whether actual. He wasn't under any delusion. He wasn't being affected by anything. And they want to ignore the fact that their own experts have said this. The only thing his expert ever pointed to was what he called personality traits based on some subjective testing. And even then he could only say that individuals that exhibit these traits sometimes fall in those traits. He couldn't say Mr. Varnell was actually susceptible to anything. I think that Mr. Varnell has been shown to have wanted to plan this. He went to great lengths using features such as text lock, directing the undercover to use text lock in his words so people couldn't read their messages. He reached out to the undercover about wanting to recruit three percenters. He picked the bank first building as his target. He said he wanted to use the type of device that Timothy McVeigh had used. He wanted to do this in November on Guy Fawkes Day, but the undercover testified why they didn't want to wait that long. They're afraid he could go out on his own. The defendant came up with this plan and was simply provided the opportunity to execute that plan. And he should be held accountable as he was by the jury for that. I see my time's up. Thank you. Actually, you had another 20 seconds because you lost some time, but I think we understand your argument. Is there one point that you needed to add? I don't believe so, your honor. I believe our brief covers most of our points. Very good. Thank you, Ms. Jordan. You have a minute and 43 seconds. Thank you. Your honors, the government claims that if they had not done this, then somebody else may have stepped in and been the person to help him do it. But the fact is that when the government inserted itself into what was going on, the appellant was lawfully and peacefully minding his own business. He was not interested in committing this crime and he could not have committed it. Judge Seymour, you asked the question and then forgot it. Wasn't there evidence presented at trial that he didn't have the money to do this? And he didn't. He didn't have a job. He didn't have money. He didn't have a car. He didn't have a driver's license, which came out in the interaction with the agent after they built the bomb. So he would not and could not have committed this crime. And when the government creates crime for the purpose of prosecuting it, when it creates crime that wouldn't otherwise occur, it doesn't deter misconduct. It doesn't protect society and it doesn't rehabilitate that person. If this is acceptable government conduct, then what meaningful boundaries on police power are there? I would also like to add that there was a question previously about whether the informant was an agent of the government. And I would like to clarify that I do indeed think he was an agent of the government based on the fact that he was paid $23,000 by the government over the course of this investigation. And evidence also was presented that he could not get access to these materials if he wanted to. So I think my time is up. But respectfully, Your Honors, we ask that this court reverse the appellant's conviction based on the government's conduct throughout the course of this investigation. Thank you. Thank you, counsel. Case is submitted.